The plaintiffs charged that they were copartners in trade; that in the collection of debts due them in this State the plaintiff Wycoff had received certain notes issued by the defendants, payable to bearer on demand at the bank, amounting in the whole to the sum of five hundred dollars, of which notes they set forth a description list; that on 8 February, 1831, the said Wycoff, for the purpose of securing the safe transmission of the said notes, and according to the usage of merchants on such occasions, cut each of the notes into two parts, and on that day enclosed the first halves thereof in a letter addressed to the plaintiff Allen at New York, and on the same day forwarded the (4) letter by the public mail; that on the 10th of the same month he transmitted in like manner, by mail, the other halves; that the first parcel duly came to hand, but that the second had not been received, but was lost; that as soon as this loss was ascertained the plaintiffs sent an account of the numbers, letters, and the places where the bills *Page 12 
were payable to the principal bank of the defendants, to all their branches, and to the different banks in this State and in Virginia; that they presented to the defendants the halves received, offered an indemnity against any loss which the defendants might sustain by reason of the missing halves, and required payment of the whole amount due upon the notes; that the defendants paid the plaintiffs one-half of this sum, but utterly refused to pay more. The bill prayed that the defendants might answer to the matters charged, and upon having a proper indemnity executed, might be compelled to pay the residue of the money due upon the notes, with the interest which has accrued thereon since the payment was demanded and refused. To this bill, which was verified by the affidavits of the plaintiffs taken before a Master in Chancery in New York, the defendants put in an answer under the seal of the corporation, in which they denied the partnership of the plaintiffs, their possession and ownership of the bank notes referred to, the cutting and transmission of them, and the loss of the second halves thereof as charged. In this answer they insisted that if the facts alleged were true the plaintiffs, by the voluntary cutting of the notes for their own convenience, took upon themselves the risk of loss, and could not require payment without presentation of the entire notes. They further alleged that it had been their custom to pay the holder of a half note on presentation at their counter one-half of the amount of the note, which custom was known to their dealers, and particularly to the plaintiffs; that this custom was adopted from regard to public convenience and not upon the supposition of their liability; for they contended that at law no recovery could ever be enforced, but on presentation of the entire note; and that a court of Equity would (5) give no relief where the loss has been occasioned by the voluntary act of the holder in dividing a note. The defendants further answered that in May, 1831, one P. Lemesurier sent to their cashier in a letter, a copy whereof was annexed, the halves of bank notes, amounting to five hundred dollars, in behalf of a friend, and requiring payment of the whole sum, and in this letter there were others referring to the plaintiffs as the owners, and they stated that in answer to this the cashier wrote to Lemesurier, stating the usages of the bank; transmitting a draft on the United States Bank in New York in payment of two hundred and fifty dollars; returning the letters enclosed in Lemesurier's communication, and requiring of him if this arrangement were not satisfactory to return the draft, whereupon the cashier promised to return the half notes received; that receiving no reply, and hearing no complaint from Lemesurier, they some time afterwards destroyed these halves as useless; that in about a fortnight or three weeks after this transaction with Lemesurier the plaintiff Allen called on the cashier *Page 13 
and inquired respecting the half notes, and the cashier informed him of the payment made by draft, and that he expressed no dissatisfaction further than saying "that he thought the bank ought to pay the whole." The defendants denied that any indemnity was ever offered or demand made in any other way before suit brought; denied also that a description list of the notes was sent to their principal bank or its branches; insisted that if the plaintiffs were entitled to the payment of the notes they were bound, when payment of half was made, to notify the defendants that they refused the same as a discharge of their demand, but claimed to hold it as a partial payment; that they were bound also to furnish the defendants with a particular description of the lost notes; to make a distinct demand of payment of the whole amount, and to tender to them an additional indemnity, especially as they allege that, being about to close their business, they have burned and destroyed a large amount of their notes, half, as well as whole notes, and it was impossible for them to ascertain whether they may not have paid off the other halves of these notes received in pursuance of their usage, and destroyed them as useless; and they objected, finally, (6) that having delayed to bring their bill more than two years after the transaction between the defendants and their agent Lemesurier, the plaintiffs came too late to ask the aid of a court of Equity. To this answer there was a general replication, and the only proof taken on either side is to be found in the deposition of Benjamin J. Spruill, a witness examined by the plaintiffs. This witness fully proved that the plaintiff Wycoff, on 8 February, 1831, had the possession of the notes set forth in the list attached to the bill; that he cut the notes in two; that on that day he forwarded by mail the first halves, in a letter directed to the plaintiff Allen at New York, and that on the 10th of the same month he forwarded the other halves by mail, in the same way.
These are the allegations and this the testimony on which the cause is brought to a hearing. It is to be regretted that the proofs have not been more full, as it is quite probable that by reason of this defect we are not possessed of that accurate knowledge of the facts which would enable us to do precise justice between the parties. Upon that testimony, however, as connected with the pleadings, it is our duty to pronounce the facts such as they appear to us either by direct proof or by fair inference. It may not be amiss here to notice an objection that has been taken to the affidavit annexed to the bill of the plaintiffs. It is said to be irregular, *Page 14 
because sworn to, not before any commissioner appointed under the authority of this State, but before a Master in Chancery in New York, and that were it regular in point of form, it is not evidence on the hearing. If the objection to the irregularity of the affidavit, merely as an affidavit, were well founded, it should have been availed of by the defendants before answering the bill, and comes too late afterwards. But considered as an affidavit, it is sufficiently regular according (7) to established chancery usage. Braham v. Bowes, 1 Jacob Wal., 296. We do not regard it as evidence upon the hearing. When a bill is brought, not for discovery merely, but also for relief, the practice of the Court generally requires that an affidavit of the loss of the written instrument should be annexed; because it is this loss which constitutes the reason for changing the forum and transferring to a court of Equity an ordinary case for relief in the courts of law. The want of such an affidavit would be a good ground of demurrer. But when matters of fact are charged and denied by the pleadings of the parties, and the court is to ascertain the truth of the matters thus put in issue, the proof must come from competent witnesses; and as a general rule a man is not more competent to prove his own case in a court of Equity than in a court of law.
The Court is satisfied that the plaintiffs were the lawful holders of these notes. There is no question but that one of them had the bona fide
possession of the notes, cut them in two, and transmitted to the other plaintiff the respective halves by mail on different days, viz., on 8 and 10 February, 1831. The next information which we have about them is on 18 May, following, when the first set of half notes was sent to the bank at Raleigh by Lemesurier, claiming them as the agent of the plaintiffs, and requiring payment of the whole amount in their behalf, or if this was refused, to return the half notes. There is no proof of what was done upon this demand, but it is alleged by the plaintiffs that they received a partial payment of one-half of the amount, and the defendants allege that they paid one-half to Lemesurier in discharge of the entire demand. The fact of an actual receipt of one-half by the plaintiffs from the defendants on account of these notes is therefore not disputed, although the character of this payment is very differently represented by the parties. In defect of any other explanatory or contradictory evidence, the necessary inference from these facts is that the notes belonged to the plaintiffs. The proof of loss has been objected to as defective and insufficient. If the case were one of the (8) loss of an entire note, the possession whereof might expose the bank to a rightful demand of payment from a subsequent bonafide holder, where there might be an obvious motive and a strong temptation for pretending a loss which had never happened, we should *Page 15 
probably require more full proof. This we suppose might be obtained through the postoffice establishment at New York, which could show whether the parcel mailed at Scotland Neck on 10 February reached New York; and if it did, whether the letters enclosed corresponded to those set forth in the way-bill. The division of the notes — their being sent by different
mails — the production of and delivery to the defendants of the first set of half notes by the plaintiffs, the lapse of time without any presentation of or demand by anybody on account of the other set, and the want of any rational motive for keeping back the letter, if it had come to the hands of the plaintiffs, constitute a mass of evidence which induces us to pronounce this allegation fully proved. It is in truth rather a case ofdestruction than of loss of the notes. There is no proof on the part of the plaintiffs of a descriptive list having been forwarded to the bank and to its branches, or of an indemnity being offered previously to suit; and none on the part of the defendants of the usage of the bank to pay on half notes half the sum for which the notes were given, nor, if such usage existed, that it was known to the plaintiffs; nor of the halves received having been burned by the bank, nor of any circumstances rendering it probable that the other halves may have been received and destroyed also. The Court, therefore, must regard all these alleged facts, if they be material, as not existing in the case.
The defendants have not in their answer, nor upon the hearing, objected to the jurisdiction of a court of Equity, because that the plaintiffs, if entitled to relief, had remedy at law. On the contrary they insist that there is no remedy at law for the holder of a note who, by any mischance, is unable to present the note itself for payment, and that whenever he is entitled to redress he can obtain it only through the intervention of that court whose peculiar province it is to relieve against accident. There are few subjects on which there (9) have been such inconsistent decisions, and on which such marked changes of judicial opinion have occurred, as the competency of courts of law to give relief in cases of lost instruments, and the right of a court of Equity to take jurisdiction of such claims. Up to the period of our separation from the mother country it was considered as beyond question that no action would lie at law upon a lost bond because of the indispensable necessity in every such action to make a profert of the instrument declared on; and it was the invariable usage to seek relief in equity which, in a proper case, never refused to give it. Within the last fifty years courts of law in England have allowed such actions to be maintained, holding it sufficient to dispense with the necessity of a profert, to state that the obligation has been lost by time and accident, or destroyed by other casualty. Notwithstanding this assumption *Page 16 
of jurisdiction by courts of law, the courts of Equity have continued to hold cognizance of such demands, because they once had acknowledged jurisdiction of them; because of the ability of these courts, where there are more persons than one liable to the same debt with mutual remedies against each other, to make a complete and effectual adjustment among all the parties liable; and because of the difficulty at law of securing an adequate indemnity. With regard to bills of exchange and other negotiable instruments, there were many inconsistent adjudications in both courts. In the case of Tenesy v. Gory, decided in the reign of Charles II, and quoted with approbation by Lord Hardwicke in Walmsleyv. Child, 1 Ves. Sen., 345, a bill of exchange was drawn on the defendant and endorsed to the plaintiff, by whom it was lost or mislaid, as appeared by the affidavit annexed, and the bill prayed that the defendant might be decreed to pay the plaintiff the money, the plaintiff first giving the defendant security to save him harmless, which was so decreed, but without damages or costs. In 1749, in the case of Walmsleyv. Child, above mentioned, Lord Hardwicke entertained no doubt but that an action at law would lie on lost bank notes, but thought that the plaintiff might also sustain a bill in equity for relief, upon (10) annexing an affidavit of the loss and submitting to give security. In Glynn v. Bank of England, 2 Ves. Sen., 38, he stated that upon a lost note there was a clear relief at law, and that a man is not entitled to bring a bill in equity in general on a lost note, but that he might do so under special circumstances. What these are he does not state, but he seems disposed to exercise jurisdiction in the case before him, which was that of a bill brought by the representatives of a dead man touching several bank notes alleged to be lost, praying a decree for the payment of them, upon offering to give security to refund and indemnify the defendants in case any other claim should be made upon them. In 1810, inMossof v. Eadon, 16 Ves. Jun., 430, where a note before it became due was cut in two and one of the halves lost, Sir William Grant refused to give relief, notwithstanding a full conviction that the merits were with the plaintiff, because there was clear relief at law, and that he was fearful to break down the barriers which separated the jurisdiction of courts of law and courts of Equity. In 1817, in Davies v. Dodd, 4 Price, 176, ChiefBaron Richards gave a decree in favor of an endorsee against an acceptor of a lost bill of exchange, stating that it did not become him to say whether the plaintiff had or had not a remedy at law, for if he had, he has also a remedy in equity; and if he had commenced an action at law, the defendant might have restrained him by injunction from proceeding, because a court of law could not compel him to give security which a court of Equity would hold that he was entitled to. He added: "There are *Page 17 
many cases of this nature, particularly where bonds have been lost, where the parties have come into equity on that very ground, and the case of anegotiable bill is yet stronger."
There were many adjudications at law in which plaintiffs recovered upon lost bills and notes, and among the latest, one before Lord Tenterden
(then Chief Justice Abbott) in 1826. Glover v. Thompson, Ryan Moody, 403 (and 21 Eng. C. L. Rep., 472). But in 1827, in the case ofHansard v. Robinson, 7 Bar. Cres., 90 (and 14 Eng. C. L. Rep., 20), the Court of King's Bench, through Lord Tenterden, (11) pronounced their unanimous judgment that an endorsee could not recover at law against an acceptor on a bill lost, after it became due, and after the plaintiff had required payment and offered an indemnity. The Court declare that it was impossible to reconcile the decisions, and therefore recourse must be had to principle; that according to the custom of merchants, the holder of the bill was to present the instrument at its maturity to the acceptor; demand payment of its amount, and upon receipt of the money deliver up the bill; that the acceptor paying the bill had a right to the possession of the instrument for his own security, and as his discharge and voucher pro tanto in his account with the drawer; that he who has lost the bill and cannot give the possession thereof to the acceptor, has not a legal right to require its payment; and that his remedy must be to tender a sufficient indemnity to the acceptor, and if it be refused, then enforce payment in a court of Equity. Since this adjudication the courts of Equity in England have had no scruples in exercising jurisdiction in cases of lost bills and notes, giving adequate relief thereon. See Macartney v. Graham, 2 Sim., 285. It is not surprising that during the clashing of judicial decisions in England similar differences and repugnances should have occurred in this country. In many, we believe in most of the States of the Union, suits on lost bills and notes are brought at law — in some they are brought in equity; but we are not aware of any adjudication in any State having distinct courts of law and equity that such claims are not within the jurisdiction of a court of Equity.
We do not decide whether an action on a lost bill or note can or cannot be brought at law. When it is considered that all written engagements for the payment of money, whether with or without seal, whether payable to order or not payable to order, are by our laws negotiable; that many of these, and among them the bank notes which constitute the currency of the State, are for sums too small to render them fit subjects of a controversy in a court of Equity; that there may be a difference between the loss properly so called and the destruction
of the negotiable instrument — nay, between a demand against one who is ultimately chargeable thereon and him who on payment (12) *Page 18 
thereof has a right to charge it in account against another — we should weigh well all the bearings and consequences of the adjudication of such a question and make it, when it becomes necessary and is the direct point involved in the controversy, and not before. But however this may be, we have no difficulty in sustaining the jurisdiction of a court of Equity. Accident is one of the peculiar and proper grounds upon which its aid may be rightfully invoked. It can give redress better suited to the nature of the controversy, more safe for all the parties concerned, and rendering unnecessary an application to it from any of them for relief against a harsh judgment at law. If therefore the claim might have been prosecuted at law, it is nevertheless a proper subject of equitable cognizance. If it could not be sued on at law, it may be prosecuted in equity for that very reason.
The plaintiffs, having been the lawful owners and possessors of these notes, if the same have been lost or destroyed without their fault, have a right to recover what is justly due upon them. In the case of Walmsleyv. Child an objection was raised because of the import of the contract, the notes being payable to bearer, and transferable without assignment; but, observed the great Judge who decided that case, this "is carrying it too far to say in any case, for undoubtedly one having lost his note or security is no reason why he should lose his debt; but a note lost in that manner is a strong reason why the defendant should hold his hand and receive the fullest satisfaction that it would never be demanded of him." But it is objected in the present case that the loss or destruction was occasioned by the voluntary act of the plaintiffs, and therefore they cannot any more in equity than at law entitle themselves to demand payment thereof without the presentation of the entire notes at the places where the same were payable. We think this objection unfounded. The cutting of a note into two parts, unless done with the intent to destroy the note, is not of itself a destruction of it. While the two parts exist, and are retained by the lawful holder, the (13) rights and liabilities of the parties remain precisely the same as before the division. If one of the parts be afterwards lost or destroyed, the right of the former holder of the note and the obligation of the maker are the same as though the whole note had been destroyed. Had the notes in this case been put into the mail in their original state, and then the loss occurred, it might with equal plausibility have been urged that the plaintiffs for their own convenience took upon themselves the risk of loss, and can therefore demand payment only according to the letter of the engagement. If the law warranted such an usage as that alleged by the defendants, of paying upon a half note, by whomsoever presented, half the amount of the note, the *Page 19 
risk of injury to one or the other of the parties would be the same in the transmission by mail of a divided as of a whole note. In the former case there would be indeed a double chance of casualties, but only the danger of half of a loss upon each casualty. Such an usage however is wholly unsupported by law. The holder of a half note, as such, has no right to any part of the money. Such an usage has a pernicious tendency to facilitate the receipt of money by the dishonest holders of half notes, and thereby creates or multiplies temptations to dishonesty. The transmission of divided notes by several mails diminishes the danger of injury as to one of the parties, and does not increase it as to the other; is for the benefit of commerce; affords additional security against dishonesty by lessening the inducement to commit it, and ought in no manner to affect the rights of the lawful owners of the notes.
In England and in the States of this Union the propriety of this course of remittance has been again and again recognized, and we cannot therefore admit that the plaintiffs have lost the notes through their fault.
It has been seen that the parties differ materially as to the circumstances under which payment of part of the money was made, and that we are without the means of ascertaining to whose representations greater faith is due. Had the answer been on oath, it might have been evidence for the defendants. But it is not on oath, and therefore can be viewed only as a denial of the allegation of the (14) plaintiffs and as an allegation of facts on their side. It would seem, however, from the letters of Lemesurier, distinctly requesting if the bank should not comply with the requisition made for a full payment to return the half notes, that the first irregularity was on the part of the defendants in keeping these and sending half the amount claimed. If a binding agreement could have been made (which we greatly doubt) to receive this sum in discharge of the whole claim, such an agreement is not proved. The time which elapsed before the filing of this bill is clearly not such as to affect the plaintiffs with laches, or to afford any valid objection to relief.
The defendants had certainly a right to ask a satisfactory indemnity, and also prima facie evidence of the loss of the other half notes before the plaintiffs could in conscience insist on payment. No such evidence appears to have been given, and no such indemnity offered, before the filing of this bill. This omission does not destroy the right of the plaintiffs, but it affects their claim to damages and costs. Following the example in the old case of Tenesy v. Gory, we shall decree for them the unpaid part of the principal of the notes only, and the parties must respectively defray their own costs. The sum decreed to be paid, when bond shall be given in the penal sum of five hundred dollars, with such *Page 20 
sureties as shall be approved by the clerk of this Court, with condition to save the defendants harmless from all claims for or on account of the notes set forth in the list annexed to the bill.
PER CURIAM. Decree for the plaintiffs.
Cited: Carter v. Jones, 40 N.C. 199; Fisher v. Carroll, 41 N.C. 485;Streator v. Bank, 55 N.C. 32; Barringer v. Andrews, 58 N.C. 350; Fisherv. Webb, 84 N.C. 46.